Please be seated. When the clerk calls the second case for oral argument, we would appreciate it if the parties would approach the podium and tell us who you are and who you represent, starting with the attorney for the epaulets. Good morning. Michelle Truesdale and Lawrence Wolfe Levin, counsel for the epaulets. Now, are only one of you going to argue, or are we going to hear from both of you? No, Ms. Truesdale will be doing the argument, Judge. Good. Thank you. Any time, George. And for the epaulets. For epaulets, I'm Michael Kreloff, and I represent SEIU, Illinois Council PAC. There are three labor unions that are all represented by council. I will be arguing for all five defendants, the three unions, Alderman Arena, and then also for Comcast. But I do hope to share any remaining time with Mr. Tom Jergel. I'm Logan Lowe for Defendant Comcast Corporation to address any separate Comcast issues. Okay. Very good. Any time you're ready, Ms. Truesdale. Thank you, Judge. Let me ask you a question. Are you going to deal with the second sound hold case? Are you going to use the second sound hold case? Yes. Yes. Yes, sir. Thank you. May it please the court. This case can be determined on a single issue. Does John Garrido's lawsuit constitute a slap? And the answer to that is no, it does not. The reason why was first set out in the Illinois Supreme Court case of Sandholm, and then followed and clarified by this court in a series of cases beginning with Hammond's, Ryan, and the most recent case of Jurczyk. Now, in Hammond's, Justice Quinn laid out a clear three-prong test to determine if a lawsuit constitutes a slap and would consequently fall under the act. Now, the circuit court in this case, in its ruling on the motions to dismiss, determined only the first prong of that test. And the first prong is whether the defendant's acts are in furtherance of their right to petition or participate in government action to obtain favorable government action. And here, that prong is not in dispute. The defendant sent mailers and aired a television advertisement during the campaign for the 45th Ward aldermanic position. Now, as determined in right development, the act expressly encompasses exercises of political expression directed at the electorate. These mailers and this TV advertisement were directed at the citizens of the 45th Ward. So that prong of this test is not in dispute. But just because those acts are the type that the act intends to protect doesn't mean that the plaintiff's suit constitutes a slap and doesn't mean that it is subject to dismissal under the act. The second prong is whether the defendants have proved that the plaintiff's claims are solely based on or solely related to the defendant's acts in furtherance. Now, said in another way, are the plaintiff's claims genuinely seeking relief for the damages that were incurred and therefore not subject to dismissal? The defendants have not met their burden in this case. And, in fact, evidence exists in the record that shows the contrary. In determining the second prong of the test, there are factors that can be considered, including whether or not the plaintiff's suit was filed in retaliation to the defendant's acts and whether the claim has merit. Now, the defendants have not proved that this claim was filed in retaliation. The reason why is the timing of the filing. This lawsuit was filed nearly two weeks after the election in this case. It was not filed during the election, and at the time of the filing, there were no more acts of the defendants to deter or prohibit. The reason given by Arena for not filing was that he didn't want to do this in a way that it would be attributed as a slap suit. But that's not the case, and that leads me to my next factor. During the campaign, plaintiffs sent defendants letters informing them of the false statements and inviting communication in the form of a response as to why the statements were false. That was the action that was taken during the campaign and not the filing of a lawsuit, where it could have been very well available to Mr. Garrido to file a lawsuit at the time. He chose not to. So the timing is a factor. It's not the only factor, but it's one of the factors to be considered in whether or not it was filed in retaliation. Well, but there wasn't very much time for him to act in any event because of the time length between the release of this information publicly and the date of the election.  when the actual election was April 5th. So there was an approximate two-week period of time when action could have been taken if he chose to do so during the election, and he chose not to. Counsel, other than the time of the filing, what other arguments do you have as far as retaliation? The intervening action that the letters were sent as opposed to filing a lawsuit during the election, the amount of damages claimed, because the damages in this case are not representative of a traditional or hallmarked slap action, where those seek damages in the millions. In this case, the damages were reasonable given the nature of the facts, false statements that the defendants made. Please ask and make a point, and I don't know if it's appropriate at this stage because it's a slap action. What damages could you possibly prove up in a case? Well, the damages that were calculated at the time that the suit was filed were damages that were anticipated or expected as a result of the defendants' affamatory statements, which included damages to Mr. Grito's reputation and character as a fellow member of our legal community, because he is a lawyer, as a police officer, and as a member of the community. Those are damages that can reasonably be proved up in this case. If I can ask you, and, again, this kind of is over, makes it different, is not necessarily the answer to a slap suit. Let's say we agree with you somehow and we send it back. How on earth are you going to prevail on the idea of defamation involving two candidates for aldermen in the city of Chicago? I don't know how any of them can be defamed. It's a political contest, right? That's correct. Can you cite any cases involving political contests where courts have stepped in and said, you know, you can give money to the losing party to reserve money from the winning party because they maligned you too much? Well, the damages that are sustained, Justice Quinn, in this matter were damages to his reputation in the community, not the loss of the election, the fact that he sustained damage to his reputation stemming out of the election. He lost legal business. He's a lawyer and receives his business through word of mouth, by referral. And being disparaged and defamed in his community, he's lost that source of business as a lawyer. He's also a police officer, and in that context, damages can be proved up by whether or not he didn't receive promotions as a result of these defamatory comments, whether he was not able to get other positions in law enforcement based on these comments, and general damages to his reputation as a member in his community. Those are the damages that befell him from this case. The case law that supports the, as Your Honor asked about, what case law do we have that shows that it can be? A losing candidate in an election can sue the winner for money. Well, there's the case, and this was a case that was decided by the defendants. It's Wanless v. Rothbach that says that a reckless disregard, and this is as to the element of malice, can be shown if the defendants investigated facts with their resources, and they either revealed insufficient information to support those allegations in good faith, or it creates a substantial doubt as to the truth. And that was what occurred in this case. There's also the case that the defendants cited, Catalano, which says that just because the statements don't charge the plaintiff with committing a specific criminal offense with the precision of an indictment, that doesn't mean that being accused of actions susceptible to corruption is not harmful to the plaintiff's character. Couldn't you bring these actions in a different format without using the CPA? If I may ask, Your Honor, for clarification. If you have a defamation claim, how does that have to involve the CPAs? Whether or not the CPAs... But you don't have another avenue of approach in which to... You talked about after losing this election, there could be a lawsuit. That's correct. I'm sure I'm not... The other side brought in the idea of the CPA to stiff your client. Counselor, I'm sorry. No, go ahead. Can I ask, can we get to the meritorious part? Absolutely. Define meritorious and what does the movement have to show? The movement has to show that there are no disputed facts in this case that show a lack... They have to provide undisputed facts that show a lack of merit in this case. Now, Justice Quinn and Hammonds, you ruled that other affirmative defenses, either under 2615 or 2619, cannot be considered as grounds in determining whether the claim is meritless or not. The defendants in this case brought forward in their briefs arguments about opinion, substantial truth, and whether there's innocent construction. Those factors cannot be considered as grounds under a CPA analysis whether the claim has merit. Well, isn't a slap motion always brought under 2619? A slap motion is, but the act itself has more rigorous procedures, an expedited timing schedule, the subjecting the non-movement to... But it's still a 2619? It is still a 2619. But that admits the sufficiency of the complaint? It does, yes. So whether the plaintiffs or whether the defendants have brought forward undisputed facts in this case, well, they haven't. There is a disputed fact. Even the circuit court ruled that there was disputed issues of material fact in its ruling. The falsity of the statements are in dispute. Plaintiff submits that the statements are, in fact, false. John Garrido never took money from a parking meter company. The parking meter company that the defendants reference is LAZ. John Garrido never took money from the company that brought the parking meter deal to the city. He never profited. But his pale who gave him $1,000 did make $1.4 million. I'm sorry. I didn't hear the beginning of that. Mr. Garrido's friend who gave him two checks for a total of $1,000 did stand to make $1.4 million, right? Well, the contribution that John Garrido received from Juan Gaetan, as you said, was an individual contribution. It was his friend. He did not receive money from a company. He did not receive money from LAZ Parking, who is the parking meter company that the defendants were referencing in their ads. He did not receive money from the company that brought the parking meter deal. The defendants couldn't even put forth any evidence in the record who that was. In fact, the plaintiff, we brought forth evidence in our response motion or our response to their motion to dismiss who that company was. Receiving an individual contribution from a person that Mr. Garrido met while he was a former police officer who he met taking a class, the Metropolitan Leadership Institute class, that's where the donations stem from. That contribution is not what the defendants published. They published the statement that he took money from the parking meter company. He took money from the company that brought the parking meter deal to the city. And they also published a false statement that he would draw two city pensions if elected. That is not true. That evidence is shown in the record. But he could have. Not during this election. No, but he could have. After 10 years, he would be eligible for a pension if he was alderman for 10 years. Those facts are not applicable to the election that the defendants were disseminating the statements in. So that was not a true statement at the time. No. It's a foreseeable event. Maybe yes, maybe no. There are so many factors. There are a lot of aldermen who have served over 10 years. That is true. However, at the time the statement was made, it was not a true statement. It was a false statement. And whether it was foreseeable, so many other factors can be taken into consideration. And whether he would run again, whether he would be elected again, many factors are considered. Was he, Mr. Garrido, was he currently employed as a police officer? Yes, he is. And as such, wouldn't he, I think there might be one other alderman in that situation, he draw a check from the police department and from the alderman? No, he has to retire. Take a leave of absence. Not retire, but take a leave of absence. Yes. Counsel, can I ask you, is there agreement as to what the term double dipping means? Does it mean taking two pensions or does it mean working for the city and taking a government pension? Well, there isn't an agreement on that issue. What the source of the defendants cited to substantiate that allegation, that claim against Mr. Garrido was an article that stated retire from one job, drop a paycheck from another city job or county job. That was the gist of the article that the defendants cited to. So they were referencing you retire, you start receiving a pension from one job, and then you receive a paycheck from another. And that in no way supports the allegation that John Garrido would receive two city pensions or double dip and take two times the amount of tax dollars from the residents of the city or taxpayers of the city. Is there anything that disallows someone from leaving one position, taking a pension and going into another position and then taking a pension from there as well? Does anything disallow that? No. But the defendants made that statement in the context of it being corrupt or they were stealing, that somebody would be stealing or taking taxpayers' dollars. That insinuation, the inference that the defendants were making, was that John Garrido wanted to be an alderman just so that he could have two pensions, just so that he could double dip and take two taxpayer pensions from this job. It was for monetary gain. The other issue on the merits of the case is that there's a disputed fact whether or not these defendants published the statements with malice, whether they knew the statements were false or acted in reckless disregard for the truth. The evidence that the defendants claim that they did not act with malice, that they believe the statements were true and they published them because of that, but you have evidence to the contrary. They cited two sources that don't support the statements. And as I stated earlier in the case of Wellness v. Rothbach, if the defendants investigated facts with their resources and they reveal either insufficient information to substantiate a good basis for the claims or that somehow show a substantial doubt as to the truth, that can be considered reckless disregard. That's what we have in this case. The defendants knew from John Garrido's D2s that he didn't receive money from the parking meter company. They knew from his D2s that he did not receive money from the company that brought the parking meter deal. They knew he received two $500 contributions from Juan Gaitan, a former Chicago police officer who he met at the Metropolitan Leadership Institute class. That was the extent of the donation. The defendants couldn't even establish through their sources or through these articles who brought the parking meter deal to the city or that Monterey security, even if they were able to make that connection, which they did not, that Monterey security brought the parking meter deal to the city. In addition, as I just stated, their article on the pensions does not support that he would receive two pensions. So they listed these sources. They didn't support the statements, but they published the statements anyways. Further evidence of malice is the fact that they received these letters after they published the statements stating that the information was false, requesting that they stop publishing, inviting any type of response from the defendants as to why, and they continued to publish anyways. There's also evidence in the record, Your Honors, that there was collaboration by all of these defendants to publish the same or substantially similar statements that were defamatory and cite the same two sources. There was even an admission by one of the defendants in their affidavit in support of their motion to dismiss that stated that they collaborated, this was a collaborative effort, to publish these false and defamatory statements. As I mentioned, the defendants did focus the merits of their claim on other grounds, other 2619 affirmative matters, opinion, substantial truth, and innocent construction. Those factors should not be considered when analyzing whether the case has merits under the CPA. There has been disputed issues of fact, and if there's disputed issues of fact, then a dismissal on this 2619 motion is not proper. And clearly the circuit court recognized the disputed issues of fact in its ruling that says, Greedo argues Arena knew the statements were false because Greedo told them they were, but this doesn't prove malice. The defendants maintain they believe statements were true and investigated them to be certain. The circuit court acknowledged that Greedo says one thing, Arena says another, or the defendants say another. There's a disputed issue. But the circuit court made its ruling, however, that was before Sandholm, the Supreme Court case. That's correct, and that was a ruling that Judge Panter only looked or analyzed the first prong of the test that's now been clarified since Sandholm. But even so, the circuit court recognized that in the briefing of the issues pre-Sandholm, there were disputed issues of material fact. And dismissing the case with those disputed issues of material fact was improper at that time. Are you waiving your arguments on the unconstitutionality? We believe that this case can be decided on non-constitutional grounds. That was clearly set forth with the series of cases that came post-Sandholm by this court. Do you want to wrap it up? Yes. Then we just have five minutes for rebuttal. Okay. So the first two, the second factor was not met by the defendant. They did not meet their burden. So this court does not need to consider the third prong, which is whether or not the plaintiff failed to show by clear and convincing evidence that the defendant's acts were not genuinely aimed solely at procuring favorable government action. As this court knows, there was limited discovery was denied in this case. And the plaintiff was at a disadvantage to meet its burden. However, in our response brief to the motion to dismiss, we put forth the evidence that does meet this third prong of the test, should this court determine that it needs to get to that point. But we submit that it does not. I will reserve five minutes for rebuttal. Thank you. Thank you. Secrela? Secrela, were your union clients acting and collaborating with one another in this case? We certainly did have a joint goal in mind. I thought that's what unions did. Yes, sir. I may please the court. We obviously see the case quite differently, and I do want to respond to some of the interesting questions that were raised. Let me start off by saying, really following up on Justice Simon, this case was being pleaded and argued pre-Sandholm. And this was sort of a sword hole being held over our heads. We didn't know what the Supreme Court would say. We were worried about it. They could have struck the whole statute down. When it came down, we breathed a sigh of relief. And then when we see the two follow-up cases actually authored by the panel, we think we still, we strongly urge, we still have a very strong case that deserves affirmance under Sandholm, under Ryan, under August. And I want to get into those reasons. We have to still look at the basic purpose of the SLAPP Act, which is a strategic lawsuit intended to chill participation in government or to stifle political expression. There seems, in our opinion, no doubt that that's what it is. What plaintiff is saying is, no, no, no, this is a case about getting compensated for damage to our reputation. It's not, is it that, though, or is it about shutting us up, teaching us a lesson, chilling our rights, getting even, or slapping back? We think the record is very clear that this is what went on. Part of the reason that we can reach that conclusion, and we urge this Court in its de novo analysis to reach that same conclusion, is the evidence of meritlessness and retaliation. And I'd like to focus on those. First of all, you know, we're still waiting for a plaintiff to admit, you know, when they tell this Court, page 8 of their brief, you know, when they say there was no connection between this company and the parking meters. It's clear. Page 710 of the record, it is clear. Monterey was a minority subcontractor, according to the article, and we have every right to believe the article's factual accuracy. Monterey was a minority subcontractor of Laz, and every one of those companies is bringing this deal to Chicago. We have a right to say that. I think what plaintiff wants is that we put out mailings that say, Mr. Garrido received a contribution from a police officer friend who then owns a company who then became a minority subcontractor to another company that had a very controversial arrangement on parking meters. That's not realistic, and that's something this Court ought to really strive mightily to avoid. You do not want to be refereeing every piece of mail that goes out in a campaign. Now, I don't have to take the extreme position that you have no right to look at political campaigns. Counsel, can I ask you, as far as the pleadings here now, it's a 2619 motion, correct? Yes. And you admit the sufficiency of the complaint? Well, we have to. We're sort of in the catch-22 of that. But you do under 2619, right? Yes, ma'am. And in the various briefs that I read, there was a lot of picking at what was in the plaintiff's complaint as far as trying to not disprove But that's not really what's at issue here in a 2619. Well, we do have to affirmatively show. It's our burden to show meritlessness and retaliation. I certainly agree with that. So let's get to the definition of meritless. How does one show meritless in a case like this? All right. We believe that the record is very clear that we have shown it by the record that we put in about the article from the Sun-Times, the article from Fox News. I should add, by the way, if you look at the record at C30 and 32, you see that the plaintiff was informed way back then what was going on with these allegations. So are you saying you've got an affirmative defense of substantial truth? Or what are you arguing? We're arguing meritlessness, Your Honor, which, as I understand it, is our burden to show. It sure is. But that's what I'm trying to get out of you. What's your definition? How do you show meritless other than you're telling me some facts? Is it an affirmative defense you're offering? I guess it does work that way, yes. I would say so. If that were true, though, right, Sir Kreloff, under 619, can you show, would you be allowed to show meritlessness or any other affirmative defense? Well, that sort of gets back to the Catch-22 I'm referring to, that somehow we have to look at it. Expound on that, if you would. Pardon me? Expound on that, if you would. Well, looking at Sandholm, looking at especially Ryan v. Fox, we have no choice and we have to accept our burden to do this. How else to do it but to come forward with a published article that I think there's no, well, first of all, under MAG, the other side would have to always show malice. This is a public figure. It's not the high school coach of Sandholm. But then when you couple that with the article from Fox and from the Sun-Times, we have shown that we had every right to rely on this and, therefore, did nothing libelous. Counsel, let me ask you this. As far as Wright v. Walsh, the holding in that is that you must disprove an essential element of the plaintiff's claim in order to show meritless. Has that been done here? Of the prima facie case, you'd have to show that there were some, you were able to disprove that. That's what Walsh says. And the pleading, the complaint is saying that we, basically, we lied when we said that there was a connection between the contributions received by Mr. Garrido and the parking meter deal. What about the double dipping? The? Double dipping. The double dipping, that's an admission, really, by the plaintiff. They've said in the trial record that, yes, he will be eligible to get a second pension. Well, was it in the present tense or the future tense, or how was that added? Well, Your Honor, I think you're getting back to the same problem. I don't, I, we said that he will be eligible, I believe. He will be? I would need to check the exact language, Justice Connors. I certainly, we do have the right, we have every right to say that he is eligible, is, not will be, but is eligible for a second pension when he starts doing this because should he serve the ten years, he will get that pension. If, you know, if he resigned in a year, no, of course he's not going to get it. So how's it retaliatory? Okay, retaliatory, there's, as Your Honor said in Ryan, we can still look to Hytel for some of the factors. It's case by case, and the court needs to look at all these specific issues here. First of all, we think the relationship with meritlessness argues incredibly strongly for retaliatory, that these are pretty garden variety allegations when you talk about both the pension and the so-called corruption that we never accused him of, and then certainly we disproved their complaining about the parking meters. So no merit, speed of suit, that it was brought ten days after the election was over, and I should add, where is the damage here? How could he even know what damage there is as a police officer or damage in the community in general, none of which is pled, I understand we're accepting the complaint, but none of which is pled as to how he could have been damaged in those ten days. He moved fast because he's slapping back at us. He's basically, I would suggest, an angry, unsuccessful political candidate. Losing the election is not relatable. We know that from MAG. And so there really are no, comparable to Sandholm, there are no real damages. It's not like this high school coach that's sort of thrust in the spotlight. This is a political figure who chose to come in here and, you know, move very quickly because he was disappointed that he lost, angry that he lost. Finally, damages. Let me ask you, as far as retaliatory, on page 23 of SEIU's brief, they say, Guarido said, I want to make sure the unions can't tell outright lies about me. Is that retaliatory? That said, yes, it could be read in more than one way, but certainly we read it to say this is about future intentions of the candidate. There's a candidate who's run twice, we think he'll be running again. There is a real interest in telling the unions you cannot speak out and telling Comcast you must listen when I send you a letter. And if you don't, you'll pay for it. And that's the retaliation. Let me just add on damages. We do approach very closely the Hytel numbers because it's $300,000 times three counts. That's $900,000. There's the unspoken number in the punitive damages, why it would be punitive when there's no evidence of malice. In this case, I do not understand. And finally, attorney's fees. Under what statute would plaintiff be eligible for attorney's fees? Those numbers are being put in there prior to any actual damage ever being able to be measured by the police officer lawyer because he wants to scare us off. And we're asking this Court to not allow that to happen. Anything else, Mr. Gergel? No, I'd like to give, if I still have time remaining, for Mr. Gergel. You have five minutes, Mr. Gergel. Take your time. And if you make it interesting, we'll use it. May it please the Court. I want to start probably with maybe the toughest issue that I've heard asked, which is if it's a 2619 motion, don't you accept the merit of the claims? Seems fundamentally at odds with the Supreme Court's direction that you have to show that the claim is meritless. Didn't they specifically tell us it's a 2619? They did. But I would point the Court to a case. This took me a while to find. But the standard for 2619 is often said that you accept the merits of the claim. But if you go to this Court's decision, and I'm going to spell it because I can't pronounce it, TKACZ v. Wiener, and it's 368 Illap III, 610. Is that in your papers? It is in the papers. It's in our section on, well, I believe it is in our papers. But this Court says, The term affirmative matter as used in 2619 has been defined as a type of defense that either negates an alleged cause of action completely or refutes crucial allegations of law or conclusions of material fact that are unsupported by allegations of specific fact. So this Court has said that when a complaint does not allege with specificity the elements of a cause of action, the defendant in a 2619 motion can come in and through its own showing, demonstrate that to the Court and obtain dismissal. And this case goes on to address and dismiss because the defendant showed the plaintiff could not make its affirmative case, its case in chief under 2619. You've got to say that's the unusual holding. It's out there. It's good law. All right. But, you know, if the statute is going to have any meaning whatsoever, defendants have to be given an opportunity to show the meritlessness of the claims. The Supreme Court says show the meritlessness of the claims, and defendants have to be given that opportunity. Well, what about Wright v. Walsh that says you've got to disprove an essential element to the claim? That has been done by Comcast, I believe, by all the defendants, but it certainly has been done by Comcast. There's no false statement in the advertisement that Comcast is accused of running. Comcast is not on the hook for every advertisement in this case. There is a single advertisement that was shown by Comcast, paid for by SEIU. Comcast also ran an ad from Grito. It's a neutral party here. And that ad said that Mr. Grito took a contribution from a company making millions from the parking meter deal. That is true, and that's been demonstrated by the evidence in the record. How has that shown that they made millions? Millions through the MyFox news article that showed that it was the allegations. It said $1.3 million. It says that that's what they expect to receive or that's what they made? Well, the Sun-Times article says that it was reported to the city that Monterey Security had already received hundreds of thousands of dollars and stood to gain more. And if you read the articles, it says in 2009. So the inference is that it was going to make more money in future years. So there's no false statement that's been affirmatively disproved. There's no false statement in the ad as to Comcast. And Comcast has also affirmatively disproved actual malice, which is not an affirmative offense. It's an element of plaintiff's cause of action. And how have you shown that? Well, the plaintiff's whole theory of actual malice as to Comcast hinges on the letter that it sent to Comcast. Comcast didn't make the ad. It wasn't responsible for its creation. It ran the ad, and Grito's theory is, I sent you this letter, and this letter informed you that the ad was false. I urge the court to look at the letter. The letter does not articulate any of the reasons that he's now come forward and articulated in his complaint. The theory in his complaint, well, he's got two theories, one that sounds like he's walked away from. One is that moderate security actually didn't profit from the deal, that that's not sufficiently proven. He's never come forward with any affirmative evidence of that. It's his campaign contributor. He could have submitted a declaration to that effect. Isn't that your burden to come forward with that? We did. We came forward with evidence in the news reports. Well, that one article. Yes, yes. But the question is, is there a triable issue effect on that? And the only evidence is one way on that issue. Defendants can met the burden on that. In Comcast's case, they say this specific advertisement communicated by implication. It didn't say it. It implied that he took a contribution from LAZ Parking. Well, his letter didn't say that. He didn't tell that to Comcast. This is a letter that he sent one week before the election, said this advertisement is false, and he didn't put forward any facts that Comcast concluded was false. And the advertisement itself cited sources that demonstrated it was true. In fact, that he had accepted a campaign contribution from the president of a company who was making millions from the parking meter deal. So this is the case. And the reason, I should point out, this isn't an accident that there's affirmative evidence in the record. Plaintiff anticipated Sandhole. Plaintiff argued that the CPA wouldn't apply if his claims had merit. And so defendants met that burden. They said, Comcast in particular said, we don't agree that's the law. We turned out to be wrong. But even if it is the law, here's our evidence that his claims lack merit. On top of that, damages. There's no case whatsoever that a losing candidate can recover damages in this type of situation. Now, are we supposed to submit affirmative evidence on that? I mean, in the typical case. Lacey claimed that wasn't their damage. Losing the election. That is part of their damage. Well, she argued today it was loss of. Well, there's certainly no well-pleaded facts as to those damages whatsoever. So we didn't accept that he had damage in filing the 2619 motion. And it's not reasonable to infer that a plaintiff in that circumstance would be damaged as a union protected police officer, as an attorney. It's certainly not plead. But it is. Again, this is a procedural case. It is. Procedural statute. Is that in the trial court relies strictly on slap. Did the judge not in ruling on this? That's correct. And so let's assume that I completely agree with everything you just said. Okay. That I don't see how a candidate gets money out of this stuff. If we were to disagree with you on the gist of on the slap aspect of it, we're sending it back. And nothing will prevent you from citing other reasons, including some 619 failure to state a claim about damages or to ask for summary judgment. Because there seems to be very little argument as to you as to Comcast, what they did. Right. Two responses. If I can respond to that. The question of whether the facts submitted to the trial court create a question of law that this court reviews all the time. And when it reviews summary judgment motions, that's a question of law. They submitted a robust presentation in response to defendants' motions to dismiss. They put on their best case. They submitted a declaration from Mr. Grito setting forth how he'd been damaged.  They put everything they could into their case. Defendants put on their affirmative evidence. The plaintiff articulates tribal issue of fact as if there's some unresolved issue. Now, the question is, if she's got four elements to prove as part of her case, is there a tribal issue of fact as to any of those? We're talking about elements of defamation. Defamation. That's correct. And so. See, we're not talking about that. We're talking about the elements of CPA. Correct. The plaintiff's burden is to go forward and prove what? It is defendants' burden to show that the claims are meritless. And as a practical matter, that burden can be shown, as it has been shown here, by the absence of a tribal issue of fact that would preclude the entry of judgment as a matter of law. This is not a case that's worth trying because plaintiffs can't show damages. We've demonstrated that law selection damages are not recoverable. Defendants have demonstrated that the claims of the advertisements, in particular the allegations in the SEIU television advertisement, are true. Not substantially true. Are true. And in Comcast's case, and other defendants have made similar showings, that there's an absence of actual malice, which is part of plaintiff's affirmative claim in chief. They had a basis. The basis for the advertisements was cited right in the advertisements, which were amended to the complaint, part of the complaint, part of the record. And I would just urge. Thank you for attaching them to the brief, by the way. Yeah. It's helpful. No, you attached them to the brief. Yeah, yeah. I think the other point the defendants as a whole believe strongly is we don't want to fight about our attorney's fees. We think there are plenty of good reasons in the record that this judgment, the judgment of dismissal, can be affirmed. It's 2615, 2619. The record demonstrates that these claims have merit. Nothing is going to change below. The only thing that possibly might change, if the court finds that we haven't sufficiently demonstrated meritless under the CPA or retaliatory under the CPA, is we could go back and litigate that issue. But as a practical matter, that requires us to invest even more money in the hope of recovering a portion of our attorney's fees. It doesn't make sense. We're here. The record's the same as it's going to be 18 months from now. If you send this back and it's dismissed and it comes back, you're going to be entertaining the same arguments at that point. And I would submit to you nothing will have changed other than defendants will have incurred a lot more attorney's fees, hundreds of thousands of attorney's fees across all defendants. And that was the purpose of the slap statute. Comcast, in particular, is an innocent party here. They had no stake in this election. Their only crime is that they ran Mr. Guido's advertisement. And I would urge you to go back to Sandholm. And when Sandholm talks about, now Comcast is a corporation. Corporations are covered. Citizens United from the United States Supreme Court say that when it comes to First Amendment rights, corporations have the same rights and that you can't discriminate based on the wealth of the speaker. Comcast has equal rights under the CPA. And Sandholm gives an example from the legislative history where they say a council meeting and then the city passed a statute that the plaintiff objected to. They sued not only the city council, but they sued the speaker at the city council meeting. Now, the facts are not the same here, but I will say that there is a very strong parallel. Comcast is not the person that Mr. Guido is angry at. They are not the person that created the ad. They are not the person that did the act that he alleged damaged him. They are collateral to that. They are like a school that made their gymnasium available for candidates for. If one candidate gets up and says something that the other one doesn't like, they don't sue the school. They don't sue the post office for delivering a mail order that they allege is defamatory. That's Comcast's role here. It's a neutral party in this. Is there any responsibility on the media whatsoever to make sure that things that are broadcast are true? I would say, it's a broad question, Judge. You know, I think that in a situation like this, that the burden is on Mr. Guido to demonstrate actual malice, which is the standard. The standard of what the media's responsibility is defined by the First Amendment, New York Times versus Sullivan, and in similar cases like Wallace from the Illinois Supreme Court. The statement has got to be, and I urge you to read our brief, the statement has got to be explicitly false. I guess what I would say is, from Comcast's perspective, imagine getting this letter. This letter says, it gives no facts whatsoever as to the truth or falsity of this. And just because it didn't pull down an opponent's advertisement 15 days later, it's being sued for the loss of the election. It makes no sense. That's not Comcast's responsibility. The statement would have to be so obviously defamatory. Beyond any kind of reasonable doubt, lacking in any merit, it has to be explicitly stated. I think that's very problematic for Plaintiff's case against Comcast. The advertisement doesn't say what he says it says. Comcast had no reason to believe that. And the one point that we made in our papers that I think is quite apt here is, my firm, myself, I'm involved in a lot of false advertising litigation. And when you face an advertisement where the allegedly false statement is not explicitly stated, it's implied by innuendo, the plaintiff in that case has to come forward with a survey, affirmative evidence, that this advertisement is actually communicating that message. And a judge, and there's plenty of case law that we cited to you on this, a judge could not even make the call, absent such survey evidence, that the implied message is actually being communicated. And that's what, if Plaintiff had even said that in his letter, we think that this advertisement that doesn't mention LAZ parking is communicating to voters that I took a contribution from LAZ parking. What's Comcast supposed to do with that? Why don't you wrap it up? Okay. Judge, we think that there are multiple grounds that the judgment of dismissal can be affirmed. We urge the court, if it has any questions on the CPA, affirm it on other grounds which we think are well supported by the record. I think I can speak on behalf of all defendants. I think all defendants have made a similar representation, that we'd rather have it affirmed and over with than to go back and have further proceedings directed solely towards the attorney's fees. Thank you. Thank you. Ms. Truesdale?  Yes. Ms. Truesdale, counsel makes an argument for Comcast that New York Times versus Sullivan and its progeny require very high standards before you're allowed to sue media companies. And are you suggesting that as a result of our legislature adopting the CPA, that we've somehow lessened the burden plaintiffs have of attacking the media companies? Not at this juncture, Justice Quinn. At this juncture, it's not a matter of the proofs that we're able to prove on the actual claim. It's whether or not the defendants have disproved the bare minimum for the essential elements of plaintiffs' claims, which they have not done. It's just a conduit. The irony here is that you're stifling the press. Comcast is just a vehicle to give information to other people. Well, in this case, Comcast wasn't just a vehicle. They obtained information that the statements were false and decided to keep on publishing those false statements. And even media, the media can be still held liable if actual malice is shown, whether they knew the statements were false and they kept publishing or they continued to publish the statements. There's case law that supports that the media can still be held liable. If the republishers of information are false statements and it can be shown that they acted with malice, they still have liability. So they have to prove malice, disprove malice. At this juncture, they have to disprove the essential elements of the claim, one of which is malice. And so the cases of New York Times versus Sullivan, those are still on. I mean, we haven't even gotten to any discovery in this case. There have been no interrogatories, no depositions. There's been no request to admit. So at this stage, it's the bare minimum of whether or not the defendants have disproven those essential elements, and we have not. I would address the Court's question that Mr. Kreloff could not answer regarding what the statements were in the mailers about the pension. If Republican John Garrido is elected, he will draw two city pensions, and you'll pay for them both. He would draw two city pensions. When he double dips by taking two pensions, we'll pay the price. They did not say he'll be eligible in some years for a pension, or in 10 years he may get a second pension. They're talking the here and now during that campaign during that election. Mr. Kreloff brought up a question about what possible damages could John Garrido have sustained just 10 days after the election. Well, the defendants are forgetting that the suit was brought nearly a month after the initial statements were made. And the stigma and the sting from being associated with the parking meters, being associated with corruption, being associated with taking two pensions, was immediate. It was instant, and it continues today. Well, he cites Magg for that proposition. And Gordon Magg was on the appellate court in the Fifth District, ran against Justice Carmier, lost, and was also not retained as a result of what he claimed were spurious things that the Illinois Civil Justice League did to him. He got nothing. This isn't the suit was not brought just because he lost the election. The suit was brought because he was defamed. That's what Gordon Magg said, too. He was thrown out. Reputation was damaged, and Mr. Garrido has, you know, makes his livelihood with other positions. He's a lawyer. He's a member of our legal community, one that relies on referrals, and he's a neighborhood lawyer who lost business as a result of the statements that the defendants made. He's a police officer who was not able to get other positions or ---- How do you prove that? Well, anyway, that's a further comment. Wrap it up. Yes, Judge. To address that Comcast said that they were collateral in that they shouldn't be a party in the suit. As I stated, they acted with malice after they received the letters and continued to publish the false statements. Justice Burke held in Sandholm that dismissal of a lawsuit pursuant to the act is a drastic and extraordinary measure. This case does not resemble your traditional or classic slap case where Goliath sues David to keep him quiet and to require him to spend amounts of money, extraordinary amounts of money, to defend a lawsuit. Here you have David who brought suit against six Goliaths and not to keep them quiet but to genuinely obtain damages for damage to his reputation and to genuinely recover relief. We ask in closing that this Court reverse the judgment or the order from Judge Panter and the Circuit Court and find that this lawsuit does not constitute a slap. Thank you. Thank you for the briefs, the arguments. Interesting case. This case is taken under advisement and this Court is adjourned. Take care.